UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| RAVIN CROSSBOWS, LLC, | ) | CASE NO. 5:18-cv-1729 |
| | ) | |
| | ) | |
| PLAINTIFF, | ) | JUDGE SARA LIOI |
| | ) | |
| vs. | ) | **MEMORANDUM OPINION** |
| | ) | **AND ORDER** |
| HUNTER'S MANUFACTURING | ) | |
| COMPANY, INC., d/b/a TenPoint Crossbow | ) | |
| Technologies, | ) | |
| | ) | |
| | ) | |
| DEFENDANT. | ) | |

By Order dated November 13, 2019, the Court, with the parties' agreement, directed initial briefing on two possibly dispositive, or narrowing, issues: (a) whether plaintiff's exercise of the "buy-out" option in the parties' Patent License Agreement was timely; and (b) whether, at the time of plaintiff's attempted exercise, it still possessed the option. (Doc. No. 83.)

Now before the Court is a motion for summary judgment of plaintiff Ravin Crossbows, LLC ("Ravin" or "plaintiff"). (Doc. Nos. 84–85 ["Mot."].) Defendant Hunter's Manufacturing Company, Inc. d/b/a TenPoint Crossbow Technologies ("TenPoint" or "defendant") filed a brief in opposition. (Doc. No. 89 ["Opp'n"].) Ravin filed a reply brief. (Doc. No. 96 ["Reply"].) With leave, TenPoint filed a surreply. (Doc. No. 99 ["Surreply"].)

I. **BACKGROUND**[1]

Ravin and TenPoint are both engaged in the design, manufacture, and sale of crossbows and related products. In late 2015, Ravin was newly organized, with no commercialized products or customers; TenPoint was well-established in the crossbow market and had patented several designs. (Mot. at 829.[2]) Ravin reached out to TenPoint seeking to license some of TenPoint's patents. (*Id.*; Opp'n at 881.) In late 2015, Ravin and TenPoint entered into a Patent License Agreement (Doc. No. 32-1 ["Agreement"]), under which TenPoint licensed certain patents to Ravin for incorporation into Ravin's products in exchange for Ravin's payment of royalties. (Mot. at 829; Opp'n at 881; *see also* Agreement §§ 1.1, 2.1.)[3] The Agreement also gave Ravin, under certain conditions, an option to "buy-out" the royalty for the balance of the Agreement's term.[4] (Agreement § 2.1.)

The legal construction of Section 2.1 of the Agreement, in particular the "buy-out" option, largely underlies the dispute between the parties. Section 2.1 provides as follows:

> 2.1 <u>Royalty Payments</u>. For the license granted herein, Licensee [Ravin] shall pay to Licensor [TenPoint] a royalty of eight percent (8%) ("Royalty") of the net sales

---

[1] For reasons that are apparent in light of the procedural background of this case, the parties' briefs cite to the pleadings to establish the basic factual underpinnings—which would typically not be permitted on summary judgment. The relevant facts are largely undisputed. The issue currently before the Court is a legal question of contract interpretation and does not depend on anyone's particular version of the *facts*. For ease of citation herein, the Court will cite to relevant pages in the parties' briefs, without repeating citations to the pleadings.

[2] All page number references are to the page identification number generated by the Court's electronic docketing system.

[3] Ravin also cross-licensed to TenPoint, royalty free, certain of its patents and patent applications. (*See* Agreement § 1.2.)

[4] With respect to its "term," the Agreement provided:

> 6.1 <u>Term.</u> This Agreement shall commence on the Effective Date and, unless terminated earlier as provided in Section 6.3 below [Termination for Breach], shall continue until the last to expire of the Licensed Patents and the Cross-Licensed Patents (the "Term") expires. The obligation to pay Royalties for a particular Licensed Product shall terminate when such Licensed Product is no longer covered by any claim of any of the Licensed Patents, whether due to expiration, nullification, abandonment, or a final judgment of invalidity or unenforceability of the applicable Licensed Patents, or as determined according to Section 2.7.

(Agreement § 6.1.)

2

> price for each Licensed Product manufactured, used or sold in the U.S., or sold by Licensee anywhere in the world if manufactured in the U.S. In consideration of the royalty-free Cross-License Grant in Section 1.2 and a pre-paid, non-refundable Royalty payment of $250,000.00 US ("Pre-Paid Royalty") due within 10 days of the Effective Date, Licensor agrees to modify the Royalty to be (i) a fixed fee of $20.00 US for each Licensed Product manufactured in the U.S. <u>and</u> shipped anywhere in the world, less Excluded Units; and (ii) after the Pre-Paid Royalty is allocated to the Licensed Products, Licensee shall have the option to buy-out the Royalty for the balance of the Term for a one-time Royalty payment of $500,000.00 US, less any Royalties paid in excess of the Pre-Paid Royalty. As used herein, "Excluded Units" means Licensed Products that are returns, warranty replacements, write-offs, promotional units, including demonstration and evaluation units, donations, and sponsorship or pro-staff units.

(*Id.*) The Agreement also specified the timing and method for royalty payments, required Ravin to supply TenPoint with reports to substantiate all royalty payments, and allowed for independent audits at TenPoint's request. (*See id.* §§ 2.2–2.3.)

The parties agree that, in November 2015, Ravin timely paid TenPoint the $250,000 pre-paid royalty. They also generally agree that, at some point during the third quarter of 2017, Ravin's sales resulted in the exhaustion of the pre-paid royalty of $250,000, based upon allocation of the $20-per-crossbow royalty. They agree that, on or about May 3, 2018, Ravin purported to advise TenPoint that it was exercising its early buy-out right under the Agreement and sent TenPoint a payment in the amount of $257,120, purportedly computed according to the contractual buy-out formula. There is no dispute that TenPoint received the notice and the payment,[5] that TenPoint refused (and still refuses) to concede that Ravin properly exercised the buy-out right, and that TenPoint continues to demand royalty reports and royalty payments from Ravin.

Ravin asserts that it properly exercised its buy-out option. TenPoint argues that Ravin's attempt at a buy-out was ineffective (and waived) because it was not timely exercised.

---

[5] The parties also agree that TenPoint eventually returned the $257,120 check to Ravin uncashed. (Doc. No. 41, Countercl. ¶ 29; Doc. No. 61, Reply to Countercl. ¶ 29.)

3

After well over a year of proceedings in the case with little progress toward resolution and following numerous discovery disputes, the Court conducted a status conference with counsel and party representatives. Following a lengthy discussion, and with the agreement of counsel and parties, the Court stayed all matters (including motions and discovery disputes) pending resolution "with respect to two issues under [the parties' Agreement] that may be dispositive of all issues in the case[.]" (Doc. No. 83, Order at 815.) The Court ordered:

> **1. <u>Audit under § 2.3 of the Agreement</u>**: By December 31, 2019, the parties shall complete an audit[1] under § 2.3 of the Agreement to determine whether, when plaintiff purportedly exercised its option under § 2.1 of the Agreement to buy out the license with a one-time payment of $500,000 less any royalties paid in excess of the pre-paid royalty (after first making its pre-paid non-refundable royalty payment of $250,000 under that section), plaintiff properly calculated the "royalties paid in excess of the pre-paid royalty."
>
>> [1] By November 21, 2019, the parties shall agree on a reputable accounting firm to conduct this audit under the Agreement. Should they be unable to agree, they shall submit by that date the names of three (3) accounting firms and the Court will thereafter make the selection.
>
> **2. <u>Briefing on Construction of § 2.1 of the Agreement</u>**: The parties agreed that two fundamental issues are in dispute — (a) whether plaintiff's exercise of the "buy-out" option was exercised timely under the terms of the cont[r]act; and (b) whether, at the time of plaintiff's exercise, it still possessed the option (in light of royalty payments already made as of that date). The Court directs briefing on these two issues as follows: plaintiff's opening brief, not to exceed 20 pages, shall be due on December 13, 2019; defendant's response brief, not to exceed 20 pages, shall be due on January 17, 2020; and plaintiff's reply brief, not to exceed 10 pages, shall be due by January 31, 2020. No surreply brief will be permitted unless ordered by the Court.

(*Id.* at 815–16 (footnote in original).)

On December 13, 2019, pursuant to the above order, plaintiff filed the instant motion.

On December 30, 2019, the parties jointly moved to extend the royalty audit deadline to January 21, 2020 (*see* Doc. No. 88), which the Court granted the next day. There was no request to extend the January 17, 2020 deadline for TenPoint's brief in response to Ravin's motion and it was timely filed on that date.

4

Then, on January 21, 2020, Ravin moved for a further extension of the royalty audit deadline to February 25, 2020 (*see* Doc. No. 90), which TenPoint opposed (*see* Doc. No. 94). The Court granted the extension. It further extended to March 20, 2020 Ravin's deadline to file its reply with respect to the instant motion, and also ordered, over Ravin's objection, that TenPoint would be permitted to file a surreply by April 3, 2020. (*See* Doc. No. 95.)

Briefing on the two issues outlined in the MOO cited above is now complete and ripe for resolution.

## II.     LEGAL STANDARD

Under Ohio law,[6] "the interpretation of written contract terms, including the determination of whether those terms are ambiguous, is a matter of law for initial determination by the court." *Savedoff v. Access Grp., Inc.*, 524 F.3d 754, 763 (6th Cir. 2008) (citing cases applying Ohio law); *see also Inland Refuse Transfer Co. v. Browning-Ferris Indus. of Ohio, Inc.*, 474 N.E.2d 271, 272–73 (Ohio 1984) ("If a contract is clear and unambiguous, then its interpretation is a matter of law and there is no issue of fact to be determined. However, if a term cannot be determined from the four corners of a contract, factual determination of intent or reasonableness may be necessary to supply the missing term." (citations omitted)).

"When confronted with an issue of contract interpretation, [a court's] role is to give effect to the intent of the parties." *Sunoco, Inc. (R&M) v. Toledo Edison Co.*, 953 N.E.2d 285, 292 (Ohio 2011). To that end, courts should "examine the contract as a whole and presume that the intent of the parties is reflected in the language of the contract." *Id.* In addition, courts should "look to the plain and ordinary meaning of the language used in the contract unless another meaning is clearly apparent from the contents of the agreement." *Id.*; *see also Alexander v. Buckeye Pipe Line Co.*,

---

[6] There is no dispute that, under Section 7.5 of the Agreement, Ohio law governs its construction.

5

274 N.E.2d 146, 150 (Ohio 1978) ("common words appearing in a written instrument are to be given their plain and ordinary meaning unless manifest absurdity results or unless some other meaning is clearly intended from the face or overall contents of the instrument"). "When the language of a written contract is clear, a court may look no further than the writing itself to find the intent of the parties." *Sunoco, Inc. (R&M)*, 953 N.E.2d at 292.

Courts may use extrinsic evidence to determine the parties' intent only if the contract is ambiguous. *Shifrin v. Forest City Enters., Inc.*, 597 N.E.2d 499, 501 (Ohio 1992). "As a matter of law, a contract is unambiguous if it can be given a definite legal meaning." *Westfield Ins. Co. v. Galatis*, 797 N.E.2d 1256, 1261 (Ohio 2003) (citation omitted). "Ambiguity exists only when a provision at issue is susceptible of more than one reasonable interpretation." *Lager v. Miller–Gonzalez*, 896 N.E.2d 666, 669 (Ohio 2008).

"[These] principles of contract interpretation establish that ordinarily judges interpret the language of contracts as a matter of law." *Royal Ins. Co. of Am. v. Orient Overseas Container Line Ltd.*, 525 F.3d 409, 421 (6th Cir. 2008).

### III. DISCUSSION

In this case, as in *Orient Overseas Container Line*, *supra*, "none of the parties have argued that the contract is ambiguous or that a factual controversy exists regarding [their] contractual intent, which would require resolution by a fact-finder. . . . Both sides argue that the plain language of the contract unambiguously favors the interpretations they advance." *Id.* at 422. Therefore, "the only questions of contract interpretation in this case are matters of law[.]" *Id*.

Ravin argues that the Agreement is "straightforward and unambiguous," and "reasonably susceptible of only one interpretation[.]" (Mot. at 836.) As a result, "the Court cannot review

6

extrinsic evidence to interpret or vary its clear language[.]" (*Id.*) Ravin claims that Section 2.1 can be interpreted in only one way:

> Ravin had the option to buy out the Royalty for the balance of the Term by paying TenPoint $500,000 less the incremental Royalties Ravin paid in excess of the Pre-Paid Royalty. The parties specified *how* ("one-time Royalty payment") and at *what price* ("$500,000.00 US, less any Royalties paid in excess of the Pre-Paid Royalty") Ravin could exercise its Buyout right.

(*Id.* at 836–37, internal citations omitted.)

TenPoint argues that the Agreement "contains two separate agreements." (Opp'n at 887.) TenPoint describes these as follows:

> The main agreement, *inter alia*, allows Ravin to practice TenPoint's patents in consideration for royalty payments. That main agreement also grants Ravin an option: TenPoint agreed to hold open a separate offer for Ravin to buy out the royalty payments for the balance of the term of the Agreement. (*Id.*) This option's offer, acceptance, and consideration terms are as follows:
>
>> In consideration of the royalty-free Cross-License Grant in Section 1.2 and a pre-paid, non-refundable Royalty payment of $250,000.00 US ("Pre-Paid Royalty") due within 10 days of the Effective Date, Licensor agrees to modify the Royalty to be (i) a fixed fee of $20.00 US for each Licensed Product manufactured in the U.S. <u>and</u> shipped anywhere in the world, less Excluded Units; and (ii) *after the Pre-Paid Royalty is allocated to the Licensed Products, Licensee shall have the option to buy-out the Royalty for the balance of the Term for a one-time Royalty payment of $500,000.00 US, less any Royalties paid in excess of the Pre-Paid Royalty.*

(*Id.*, internal citation omitted; quoting Agreement § 2.1 (underlying in original; italics added in brief).) According to TenPoint, once the prepaid royalty is allocated to the licensed products, "the option ripens and could be accepted by a 'one-time Royalty payment of $500,000 US, less any Royalties paid in excess of the Pre-Paid Royalty.'" (*Id.*)[7] Then, if Ravin "properly and timely

---

[7] One Ohio appellate court explains option contracts under Ohio law as follows:

> An option contract consists of two independent elements: (1) an offer to buy, sell, or perform some act, which becomes a contract if properly accepted; and (2) the binding agreement to leave the offer open for a specified period of time. *Aldahan v. Tansky Sales, Inc.* (June 20, 2000), Franklin App. No. 99AP–651; *Stuller v. Levering* (Aug. 23, 1996), Knox App. No. 95–CA–26. Thus, an option is

7

accepted the collateral offer held open by the option, with sufficient consideration, this would result in an agreement to modify the main underlying agreement such that royalty payments would not be required further." (*Id.*)[8]

In reply, Ravin urges the Court to reject TenPoint's invitation to "spawn[] one agreement into two" (Reply at 956), arguing that TenPoint's contractual construction is not "premised on a coherent reading of Section 2.1 of the Agreement, nor any other language in the Agreement." (*Id.* at 957.) In Ravin's view, the Agreement is "one integrated agreement" with several promises supported by one consideration. (*Id.* (citing *Fuchs v. United Motor Stage Co.*, 22 N.E.2d 1011, 1013 (Ohio Ct. App. 1938).) Ravin claims that "'[t]he contract construction urged by [TenPoint] would not be a construction at all but would amount to the making of a new contract for the parties which is not the function of the court.'" (*Id.* (quoting *Aultman Hosp. Ass'n v. Cmty. Mut. Ins., Co.*, 544 N.E.2d 920, 923–24 (Ohio 1989)).)

The fundamental dispute in this case is over the meaning of "after" in Section 2.1 of the Agreement. Ravin's view is expansive (that its buy-out option could be exercised at any time within the term of the Agreement so long as it was after the triggering event), whereas TenPoint's

---

a continuing offer, as well as a unilateral contract, binding the offeror of the option. *Leb v. Hoover Co.* (Dec. 28, 1982), Stark App. No. C.A. 5717. "An option to buy may be exercised by giving notice of an intention to purchase; such a notice is in effect an acceptance of the offer to sell." *Rossman & Co. v. Donaldson* (Dec. 6, 1994), Franklin App. Nos. 94APE03–388, 94APE03–389 and 94APE03–695. Although the holder of the option is not required to exercise it, once the option is exercised, a bilateral contract arises between the parties to the option to perform in accordance with the option terms. 1 Williston on Contracts (Lord Rev.1990) 726–727, Section 5:16.

*Cent. Funding, Inc. v. CompuServe Interactive Servs., Inc.*, No. 02AP-0972, 2003 WL 22177226, at *8 (Ohio Ct. App. Sept. 23, 2003).

[8] TenPoint offers argument in both its brief in opposition and its surreply regarding the sufficiency of the consideration that Ravin was required to pay in order to accept the option offer (assuming it had been timely exercised). (*See* Opp'n at 888–90; Surreply, *passim*.) The question is whether Ravin paid enough when it attempted to exercise the option. To that end, the parties requested, and the Court granted, that an independent royalty audit be conducted. Given the Court's conclusion herein that Ravin failed to timely exercise the option, the Court need not address this portion of TenPoint's argument.

view is more narrow (that Ravin needed to exercise the option within a reasonable time after the triggering event). Given this conflict of meaning, the Court must undertake construction of the contract, applying Ohio law.

Even if the Court were to construe Section 2.1 as containing a separate "option contract"—that is, a continuing offer—TenPoint's argument fails to address the fact that Section 2.1 contains no express time for the exercise of the option. It merely says that it can be exercised "*after*" the single triggering event—the full allocation of the $250,000 pre-paid royalty. The contract does not say "immediately after" or "upon," nor does it specify a particular number of days (as it does for the payment of the pre-paid royalty (*i.e.*, "within 10 days of the Effective Date"), nor does it state that "time is of the essence."

That said, "[a]n offer without time given for its acceptance must be accepted immediately, or not at all[.]" *Longworth v. Mitchell*, 26 Ohio St. 334, 342 (1875). Therefore, under *Longworth*, if Section 2.1 is to be viewed as an option provision, one might conclude that "after" means "immediately after" the triggering event, or at the very least, within a reasonable time after the triggering event. *See Lake Ridge Acad. v. Carney*, 613 N.E.2d 183, 187 (Ohio 1993) (the option may not be exercised after the relevant time has passed) (citing *Longworth*); 17 Ohio Jur. 3d § 20 ("[T]he offer, as well as the power to accept it, terminates at the time specified in the offer or, if no time is specified, at the end of a reasonable time."). Further, if an option provides for the *time* of acceptance but is silent as to *manner*, "it is sufficient to give timely notice and then later tender performance within a reasonable time." *Kenney v. Chesapeake*, 31 N.E.3d 136, 150–51 (Ohio Ct. App. 2015) (citing *In re Estate of de Saint–Rat,* No. CA2007-02-052, 2008 WL 1932485, at *3 (Ohio Ct. App. May 5, 2008) (further citation omitted)).

9

Here, the parties agree that the triggering event occurred roughly around September 2017, and that Ravin did not attempt to exercise the option until May 2018. They disagree on whether this exercise was timely under the Agreement.

Reading the Agreement as a whole,[9] which Ohio contract law requires, the Court concludes that TenPoint's view as to the requisite timing for the exercise of the option is generally correct. That is, "after" is used in Section 2.1 in the sense that, "upon" completion of the target event (*i.e.*, the full allocation of the $250,000 prepaid royalty), the option may (but need not) be exercised. Further, since "a party may exercise its option *only* in the manner provided in the contract[,]" *Lake Ridge Academy,* 613 N.E.2d at 187 (emphasis in original), the Court looks to the contract for guidance as to the *method* and *specific* timing for Ravin's exercise and payment.

Here, the Agreement required Ravin to make royalty payments quarterly according to a schedule set forth in Section 2.2. The parties agree that, some time during the third quarter of 2017 (*i.e.*, between July 1, 2017 and September 30, 2017), the allocation of royalties against the prepaid amount was exhausted, triggering Ravin's right to exercise the buy-out. (Mot. at 831; Opp'n at 881.) Under the royalty payment schedule set by the Agreement, the 2017 third quarter royalty payment was due no later than November 14, 2017. That date would have been the first opportunity for Ravin to exercise the buy-out option "in the manner provided in the contract." There was no need for Ravin to exercise the option mid-quarter, that is, *as soon as* the prepaid royalty was

---

[9] This is a Patent License Agreement. In exchange for TenPoint allowing Ravin to practice TenPoint's patents, Ravin agreed to pay royalties. It is no more complicated than that. Ravin also had the *option* of limiting the total amount it would ever owe for royalties by paying a prepaid royalty of $250,000 (which lowered the royalty from 8% of the net sales price to $20 for each licensed product), followed by timely buying out the remainder of the term for $500,000. If, for whatever reason, Ravin did not exercise the buy-out, it would simply continue to pay $20 per licensed product sold for the remainder of the term—which was defined very broadly in the Agreement. Most of the cases cited by both parties are not particularly helpful because they address contracts where a failure to timely *perform* amounts to a breach of the contract. That is not the case here.

exhausted (although there is also nothing in the language prohibiting such a prompt exercise), and TenPoint does not argue otherwise.

Therefore, the Court concludes that Ravin should have exercised its buyout option under the Agreement on (or before) November 14, 2017.

As an alternative, it would also have been "reasonable" for Ravin to notify TenPoint at the time of its November 14, 2017 royalty payment of its intent to exercise the option (because it had exhausted the prepaid royalty), while waiting until its next quarterly royalty payment on February 14, 2018 to pay, that is, to perform the option requirement. To reach this conclusion, the Court finds guidance in Ohio law.

In *Estate of de Saint-Rat*, cited by *Kenney v. Chesapeake*, *supra*, a party gave timely notice of her intent to exercise an option to purchase certain real estate, but did not simultaneously tender the purchase price. The probate court ruled that, because the option contract—a settlement agreement—was silent as to when the purchase price had to be paid, the party was not required to pay at the time she timely exercised the option and, further, that 60 days was a "reasonable time" for her to pay the purchase price. 2008 WL 1932485, at * 1. The court of appeals affirmed.

Here, *after* the pre-paid royalty was exhausted, it would have been reasonable for Ravin to have given notice to TenPoint at the time of its very next royalty deadline (November 14, 2017) of its intent to exercise its option, while waiting until the second-next royalty deadline (February 14, 2018) to make the actual performance payment.

Therefore, the Court concludes that, for Ravin to properly and completely exercise the option under the terms of the Agreement, it should have done so between November 14, 2017 and

11

February 14, 2018, and could have properly acted in two steps: notice of intent, followed by payment.[10]

Instead Ravin attempted to exercise the option in May 2018, when it made its 2018 first quarter royalty payment. (Mot. at 832; Opp'n at 882; Countercl. Ex. 2 [Doc. No. 41-2].) By that time, the option had expired under the terms of the Agreement. No reasonable person would believe that the intent of the parties was to allow Ravin to exercise the option *at any time* between the triggering event and the end of the Agreement's term (which is defined, in part, as "continu[ing] until the last to expire of the Licensed Patents and the Cross-Licensed Patent . . . expires[]") (Agreement § 6.1).

If the buy-out window were interpreted in that broad a fashion, it would permit exercise of the option so many quarters after it had been triggered, and so late in the term, that Ravin could have unilaterally converted the second half of § 2.1 of the Agreement (*i.e.*, the potential royalty cap) into the *primary* contract, rather than merely an *option*, effectively nullifying the first half of § 2.1 of the Agreement (*i.e.*, the agreed royalty payment of $20 for each licensed product through the end of the term, in the absence of the timely exercise of the option provision). "'In the construction of a contract courts should give effect, if possible, to every provision therein contained, and if one construction of a doubtful condition written in a contract would make that condition meaningless, and it is possible to give it another construction that would give it meaning and purpose, then the latter construction must obtain.'" *Foster Wheeler Enviresponse, Inc. v. Franklin Cty. Convention Facilities Auth.*, 678 N.E.2d 519, 526 (Ohio 1997) (quoting *Farmers*

---

[10] The probate court in *Estate of de Saint-Rat* determined, and the court of appeals affirmed, that, as a matter of law, 60 days for payment was "reasonable" because, in another portion of the same settlement agreement 60 days had been set as the time frame for a different payment. Here, the parties' Agreement contemplates quarterly royalty payments. Therefore, those quarterly deadlines are "reasonable" deadlines for performance of the option requirements under the Agreement.

12

*Nat'l Bank v. Delaware Ins. Co.*, 94 N.E. 834 (Ohio 1911), paragraph six of the syllabus). The construction herein gives meaning to the entirety of § 2.1 in the context of the whole Agreement.

The Court concludes, on the limited issue before it, that Ravin did not timely or effectively exercise the buy-out option under the Agreement.[11]

## IV. CONCLUSION

For the reasons set forth herein, the Court concludes that, under the terms of the Patent License Agreement between the parties, construed under Ohio law, plaintiff Ravin Crossbows, LLC did not timely exercise the buy-out option in Section 2.1, and Ravin's motion for summary judgment is denied.

The parties shall now confer and, by August 7, 2020, submit a joint report as to what issues remain for resolution and how they propose these issues be addressed. In addition, they shall indicate whether they are amenable to additional mediation. The Court will conduct a telephone conference with counsel on August 14, 2020 at 3:00 p.m. to discuss a plan for going forward; directions for joining the call will be sent prior to the conference by email.

**IT IS SO ORDERED**.

Dated: July 29, 2020

**HONORABLE SARA LIOI**
**UNITED STATES DISTRICT JUDGE**

---

[11] Ravin has asserted that the Agreement "capped" its royalties at $750,000 since it pre-paid $250,000. (Mot. at 843.) TenPoint disagrees. (Opp'n at 890.) Obviously, if Ravin exercised the buy-out option, it would have, in effect, capped the royalties at $750,000. Whether there is any such cap in the absence of the exercise of the option is a question currently not before the Court, but the Court sees no support for any such construction in the Agreement.